Slip Op. 19-40

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| QUAKER PET GROUP, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant. | Before: Gary S. Katzmann, Judge<br>Court No. 13-00393 |

## OPINION

[Plaintiff's motion for summary judgment is granted.]

Dated: March 29, 2019

Alan Goggins, Barnes, Richardson & Colburn, LLP, of New York, NY, for plaintiff.

Monica P. Triana, Trial Attorney, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for defendant. With her on the brief were Joseph H. Hunt, Assistant Attorney General, and Amy M. Rubin, Assistant Director. Of counsel on the brief were Beth C. Brotman and Sheryl A. French, Office of Assistant Chief Counsel for International Trade Litigation, U.S. Customs and Border Protection, of New York, NY.

Katzmann, Judge: The court returns to the question of the tariff classification under the Harmonized Tariff Schedule of the United States (2012) ("HTSUS") of Plaintiff Quaker Pet Group, LLC's ("Quaker Pet") pet carrier products. Previously, the court held that, as a matter of law, Quaker Pet's carriers could not be classified under HTSUS heading 4202, which comprises containers that organize, store, protect, and carry various items, because pets are living beings and not items. Quaker Pet Group, LLC v. United States, 42 CIT __, 287 F. Supp. 3d 1348 (2018). However, the undisputed facts available to the court at that time were insufficient to determine

whether the pet carriers could be covered by HTSUS 6307 -- a provision containing made up articles of textile that are not included under another tariff category -- or some other HTSUS heading. Id. at 1359–60. The parties have undertaken discovery and provided the court with additional, undisputed facts, which now permit the court to conclude that Quaker Pet's carriers should be classified under HTSUS 6307.

## BACKGROUND

### I. Tariff Classification Generally

In a classification case, "the court construes the relevant (competing) classification headings, a question of law; determines what the merchandise at issue is, a question of fact; and then . . . adjudges . . . the proper classification under which it falls, the ultimate question in every classification case and one that has always been treated as a question of law." Bausch & Lomb, Inc. v. U.S., 148 F.3d 1363, 1366 (1998); see Wilton Indus., Inc. v. United States, 741 F.3d 1263, 1266 (Fed. Cir. 2013). When there is no factual dispute regarding the merchandise, the resolution of the classification issue turns on the first step, determining the proper meaning and scope of the relevant tariff provisions. See Wilton Indus., 741 F.3d at 1266–67; Carl Zeiss, Inc. v. U.S., 195 F.3d 1375, 1378 (Fed. Cir. 1999); Bausch & Lomb, 148 F.3d at 1365–66.

"The HTSUS scheme is organized by headings, each of which has one or more subheadings; the headings set forth general categories of merchandise, and the subheadings provide a more particularized segregation of the goods within each category." Alcan Food Packaging (Shelbyville) v. United States, 773 F.3d 1364, 1366 (Fed. Cir. 2014) (quoting Wilton Indus., 741 F.3d at 1266). Chapter and section notes of the HTSUS are statutory law, not interpretative guidelines, and are binding on the court. Quaker Pet, 287 F. Supp. 3d at 1355 (citing

Arko Foods Intern., Inc. v. United States, 654 F.3d 1361, 1364 (Fed. Cir. 2011); Park B. Smith, Ltd. v. United States, 347 F.3d 922, 929 (Fed. Cir. 2003)).

Tariff classification is determined according to the General Rules of Interpretation ("GRIs"), and, if applicable, the Additional U.S. Rules of Interpretation.  The "General Rules of Interpretation govern classification of merchandise under the HTSUS, and are applied in numerical order."  Honda of Am. Mfg. v. United States, 607 F.3d 771, 773 (Fed. Cir. 2010) (internal quotations and citations omitted).

Under GRI 1, "classification shall be determined according to the terms of the headings and any relative section or chapter notes."[1]  See also Faus Grp., Inc. v. United States, 581 F.3d 1369, 1372 (Fed. Cir. 2009) (citing Orlando Food Corp. v. United States, 140 F.3d 1437, 1440 (Fed. Cir. 1998)).  Unless there is evidence of "contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings."  La Crosse Tech., Ltd. v. United States, 723 F.3d 1353, 1358 (Fed. Cir. 2013); Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1048 (Fed. Cir. 2001).  In ascertaining a term's common meaning, the court may "consult lexicographic and scientific authorities, dictionaries, and other reliable information" or may rely on its "own understanding of the terms used."  Baxter Healthcare Corp. v. United States, 182 F.3d 1333, 1337–38 (Fed. Cir. 1999); see Millennium Lumber Distrib., Ltd. v. United States, 558 F.3d 1326, 1328–29 (Fed. Cir. 2009); Carl Zeiss, 195 F.3d at 1379.  "Where a tariff term has various definitions or meanings and has broad and narrow interpretations, the court must determine which

---

[1] GRI 1 provides that:

> The table of contents, alphabetical index, and titles of sections, chapters and subchapters are provided for ease of reference only; for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following [GRI] provisions.

definition best expresses the congressional intent." Richards Med. Co. v. United States, 910 F.2d 828, 830 (Fed. Cir. 1990). Although not binding law, courts also look to the Explanatory Notes ("ENs") to the Harmonized Commodity Description and Coding System, maintained by the World Customs Organization, as persuasive authority on how to interpret and apply HTSUS provisions. See Home Depot U.S.A., Inc. v. United States, 491 F.3d 1334, 1336 n.1 (Fed. Cir. 2007) ("Although the Explanatory Notes 'do not constitute controlling legislative history,' they are nonetheless intended to offer guidance in clarifying the scope of HTSUS subheadings." (citing Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994))); Deckers Outdoor Corp. v. United States, 714 F.3d 1363, 1367 n.1 (Fed. Cir. 2013); see generally Alcan Food Packaging (Shelbyville) v. United States, 37 CIT __, 929 F. Supp. 2d 1338 (2013) (relying extensively on the guidance provided by the ENs to resolve the case under GRI 1), aff'd, 771 F.3d 1364 (Fed. Cir. 2014).

"The HTSUS is designed so that most classification questions can be answered by GRI 1." Telebrands Corp. v. United States, 36 CIT__, __, 865 F. Supp. 2d 1277, 1280 (2012), aff'd, 522 Fed. App'x 915 (Fed. Cir. 2013). "What is clear from the legislative history of the World Customs Organization and case law is that GRI 1 is paramount . . . The HTSUS is designed so that most classification questions can be answered by GRI 1, so that there would be no need to delve into the less precise inquiries presented by GRI 3." Id. A product is classifiable under GRI 1 if it "is described in whole by a single classification heading or subheading" of the HTSUS; however, "[w]hen goods are in character or function something other than as described by a specific statutory provision -- either more limited or more diversified -- and the difference is significant, then the

Case 1:13-cv-00393-GSK   Document 81   Filed 03/29/19   Page 5 of 12

Court No. 13-00393                                                                                                Page 5

goods cannot be classified" pursuant to GRI 1.[2]  La Crosse Tech., 723 F.3d at 1358 (quoting CamelBak Prods., LLC v. United States, 649 F.3d 1361, 1364 (Fed. Cir. 2011)).

## II. Procedural History

In this case, the Government classified the subject pet carriers under subheading 4202.92.305[3] of the HTSUS, the provision covering traveling bags and similar containers of textile material.  Amended Compl. ¶ 10; Def.'s Answer ¶ 10.  This classification carries a 17.6 percent duty rate.  HTSUS 4202.92.30.  Quaker Pet contested the liquidations by filing a protest on April 25, 2013, because it believed that pet carriers are classifiable under HTSUS subheading 6307.90.98, "Other made up articles, including dress patterns:…Other:…Other," which carries a duty rate of seven percent.  Summ., Dec. 9, 2013, ECF No. 1.  Customs denied the protest on June 21, 2013, and this action followed.  Id.  Initial disclosures were served on January 21, 2015 and supplemented on July 17, 2015.  Resp. to Mot. for J. on the Pleadings as to Count I of the Amended Compl. ("Def.'s Br."), Oct. 30, 2015, ECF No. 28, at Exhibits 1–2.  Quaker Pet moved for judgment on the pleadings as to Count I of its Amended Complaint on September 18, 2015, and the Government filed its response on October 30, 2015.  Mot. for J. on the Pleadings as to Count I

---

[2] This case need not proceed beyond GRI 1, as discussed below, and so further discussion of GRI 2 and GRI 3 is unnecessary.

[3] HTSUS 4202.92.30 covers:

> Trunks, suitcases, vanity cases, attaché cases, briefcases, school satchels, spectacle cases, binocular cases, camera cases, musical instrument cases, gun cases, holsters and similar containers; traveling bags, insulated food or beverage bags, toiletry bags, knapsacks and backpacks, handbags, shopping bags, wallets, purses, map cases, cigarette cases, tobacco pouches, tool bags, sports bags, bottle cases, jewelry boxes, powder cases, cutlery cases and similar containers, of leather or of composition leather, of sheeting of plastics, of textile materials, of vulcanized fiber or of paperboard, or wholly or mainly covered with such materials or with paper:…
>     With outer surface of sheeting of plastic or of textile materials:...
>         Other…

of the Amended Compl. ("Pl.'s Br."), ECF No. 21; Def.'s Br. Quaker Pet filed its reply on November 12, 2015, and the first oral argument was held on February 11, 2016. Pl.'s Reply Br., ECF No. 29; Oral Argument, ECF No. 35.

On November 29, 2017, the case was reassigned to a new judge. Reassignment Order, ECF No. 52. Quaker Pet filed a motion to withdraw Count II[4] of the amended complaint on December 14, 2017, and the Government filed its response opposing withdrawal of Count II on January 2, 2018. ECF. No. 57; ECF No. 59. Oral argument was held anew on January 17, 2018. ECF No. 60.

In its ensuing opinion, issued in February 2018, the court held that, as a matter of law, Quaker Pet's products could not be classified under heading 4202. Quaker Pet, 287 F. Supp. 3d at 1358–59. Under the Federal Circuit's Avenues In Leather test, "the common characteristic or unifying purpose of the goods in heading 4202 consist[s] of organizing, storing, protecting, and carrying various items." Avenues In Leather, Inc. v. United States, 423 F.3d 1326, 1332 (Fed. Cir. 2005) (emphasis added) (citations omitted). The court reasoned that because the primary purpose of Quaker Pet's products was to carry living beings -- namely, pets -- and not items, these pet carriers did not meet the Avenues In Leather test. Quaker Pet, 287 F. Supp. 3d at 1358–59. However, "the undisputed facts contained in the pleadings d[id] not provide sufficient information -- for example, the materials comprising each style of pet carrier or any procedure through which the products were assembled or otherwise made up -- for the court to determine whether the pet carriers are properly classifiable under HTSUS heading 6307 or another heading." Id. at 1359.

---

[4] In Count II, Quaker Pet argued that "[i]n the alternative, the imported pet carriers are properly classified under subheading 4201.00.30, HTSUS, dutiable at the rate of 2.4% ad valorem, as: 'Saddlery and harness for any animal (including traces, leads, knee pads, muzzles, saddle cloths, saddle bags, dog coats and the like), of any material: Dog leashes, collars, muzzles, harnesses and similar dog equipment.'" Id. ¶13.

The court also granted Quaker Pet's Motion to Withdraw Count II of the Amended Complaint, reasoning that "the court has an independent duty to evaluate all potential HTSUS classifications, and so withdrawing Count II will not prevent the court from considering heading 4201 and any other potentially relevant headings when ruling on Count I" after the relevant facts were further developed. Id. at 1360.

Subsequently, the parties conducted discovery to determine both the materials comprising each style of pet carrier and the procedure by which each carrier was assembled. Based on that discovery, the parties submitted their Joint Statement of Undisputed Facts ("JSUF") on October 5, 2018. ECF No. 73. On January 9, 2019, the court held a teleconference with the parties and requested supplemental submissions concerning the parties' positions on the appropriate classification of the pet carriers in light of discovery and the court's previous opinion. ECF No. 77. Quaker Pet filed its supplemental submission on January 9, 2019 and a motion for summary judgment on February 6, 2019. ECF No. 78; ECF No. 79. In its February 15, 2019 response to Quaker Pet's motion for summary judgment, while continuing to maintain that the appropriate classification for the pet carriers is in heading 4202, the Government agreed that, based on Quaker Pet and the undisputed facts, the court has enough information to enter final judgment. ECF No. 80.

### III. The Merchandise at Issue

The imported merchandise consists of five styles of pet carriers. Amended Compl. ¶ 5, Feb. 12, 2015, ECF No. 7; JSUF ¶¶ 2–3, Oct. 5, 2018, ECF No. 73. Pet carrier style numbers 55234, 55534, 97009, and 98791 were imported into Newark, NJ, and style number 94279 was imported into Long Beach, CA. Amended Compl. ¶¶ 6–7; JSUF ¶¶ 2–3. The pet carriers were manufactured in and imported from China. JSUF ¶ 4. These pet carriers are used to carry cats,

dogs, or other pets. Amended Compl. ¶ 8; Answer to Pl.'s Amended Compl. ¶ 8, Apr. 27, 2015, ECF No. 13 ("Def.'s Answer"). Subsequent to the commencement of this action, Quaker Pet, the importer of record, was sold to Worldwise, Inc. Letter from Pl.'s Counsel, Jan. 17, 2018, ECF No. 61. Worldwise, Inc. has continued to import the same pet carriers, typically under the Sherpa™ brand trademark. Id. A description of the pertinent aspects of each of the pet carriers is as follows:

1) Style No. 55534, the Original Small Deluxe, measures approximately 15 by 10 by 8 ½ inches and is composed of approximately 62% textile materials (nylon and polyester), 13% polyvinylchloride plastic, 5% medium density fiberboard, 14% metal (nickel plated iron), 2% fiberglass, and 4% packing material. JSUF ¶¶ 2(a), 5–6. The Original Small Deluxe is made "by cutting both the solid and mesh materials into panels of the appropriate size and sewing the panels together with zippers." Id. ¶ 8. The red trim of this model and the strap handles are also sewn onto the carrier. Id. ¶¶ 9–10. Metal clasps and rings attach the shoulder strap. Id. ¶ 10.

2) Style No. 55234, the Original Medium Deluxe, measures approximately 17 by 11 by 10 ½ inches. Id. ¶¶ 2(b), 11. Otherwise, its composition and method of manufacture are essentially identical to those of the Original Small Deluxe above. Id. ¶¶ 12, 16–18.

3) Style No. 97009, the AKC Medium Duffle, measures approximately 14 by 9 ¼ by 9 inches and is composed of 60% textile materials (nylon and polyester), 16% polyvinylchloride plastic, 8% medium density fiberboard, 12% metal (nickel plated iron), and 4% packing material. Id. ¶¶ 2(c), 19, 21. The AKC Medium Duffle is manufactured in essentially the same way as the Original Small Deluxe and Original Medium Deluxe models. Id. ¶¶ 23–25.

4) Style No. 98791, Sherpa on Wheels, measures approximately 18 $^5/_8$ by 10 by 8 ½ inches and is composed of approximately 60% textile materials (nylon and polyester), 13% polyvinylchloride plastic, 5% medium density fiberboard, 16% metal (nickel plated iron), 2% fiberglass, and 4% packing material. Id. ¶¶ 2(d), 26, 29. The Sherpa on Wheels undergoes essentially the same manufacturing process as the previously discussed models, with an additional step for attaching the wheels. Id. ¶¶ 31–34.

5) Style No. 94279, the Tote-Around-Town, measures approximately 18 by 8 by 15 inches and is composed of approximately 68% textile materials (nylon and polyester), 15% polyvinylchloride plastic, 5% medium density fiberboard, 8% metal (nickel plated iron), and 4% packing material. Id. ¶¶ 3, 35, 37. The Tote-Around-Town is made "by cutting both the solid and mesh materials into panels of the appropriate size and sewing the panels together with zippers." Id. ¶ 39. Its handles and safety strap are also sewn to the sides of the carrier. Id. ¶ 40.

Additionally, for each pet carrier at issue in this case, the textile portions account for at least 60% of the cost of the materials. Id. at Ex. 3 p. 55–56, Deposition of Neil Werde, Aug. 21, 2018.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action under 28 U.S.C. § 1581(a). In a tariff classification case, the court proceeds de novo. Park B. Smith, Ltd. v. United States, 347 F.3d 922, 924 (Fed. Cir. 2003); see Customs Courts Act of 1980 § 301, 28 U.S.C. § 2640(a)(1)(2012) (directing the Court of International Trade to review classification rulings on "the basis of the record made before the court").

## DISCUSSION

The court grants summary judgment "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a). In a tariff classification action, summary judgment is appropriate when "the material facts of what the merchandise is and what it does are not at issue." Wilton Indus., 741 F.3d at 1266–67; Bausch & Lomb, 148 F.3d at 1365. Here, as mentioned previously, the parties have submitted a JSUF detailing the characteristics of the merchandise in question, and thus material facts regarding the pet carriers are not in dispute. What remains is for the court to determine, based on these facts, the appropriate classification for the merchandise.

As discussed above, GRI I requires that classification be determined "according to the terms of the headings and any relative section or chapter notes." See Faus Grp., Inc., 581 F.3d at 1372 (citing Orlando Food Corp., 140 F.3d at 1440). Chapter 63, Note 1 provides that "Sub-Chapter I [63.01–63.07] applies only to made up articles, of any textile fabric." Section XI, Note 7(f) defines "made up" as "assembled by sewing, gumming or otherwise (other than piece goods consisting of two or more lengths of identical material joined end to end and piece goods composed of two or more textiles assembled in layers, whether or not padded)." "Assemble," as defined by the Federal Circuit in ABB, Inc. v. United States, 421 F.3d 1274, 1276 (Fed. Cir. 2005) (citing *Webster's Third New International Dictionary* p. 131 (1993)), "means to fit together the various parts of [sic] so as to make into an operative whole." However, heading 6307 includes only "made up textile articles of any textile fabric (woven or knitted fabric, felt, nonwovens, etc.) which are *not* more specifically described in other Chapters of Section XI or elsewhere in the [HTSUS] Nomenclature." Chapter 63, ENs (emphasis in original). Essentially, for merchandise to be classified under heading 6307, it must be an assembled textile article that fits under no other HTSUS heading.

Quaker Pet's products meet these requirements. The textile portion constitutes at least 60% of both the cost and material used to manufacture all five models of pet carriers. JSUF ¶¶ 6, 12, 21, 29, 37, Ex. 3 at pp. 55–56. The pet carriers are assembled by sewing together the various components. Id. ¶¶ 8–10, 16–18, 23–25, 31–34. Finally, the pet carriers fit under no other HTSUS heading. For the reasons discussed in Quaker Pet, the pet carriers cannot be classified under heading 4202. See Quaker Pet, 287 F. Supp. 3d at 1358–59.

Moreover, Quaker Pet's pet carriers also cannot be classified under heading 4201, "[s]addlery and harness for any animal (including traces, leads, knee pads, muzzles, saddle cloths, saddle bags, dog coats and the like), of any material." The Explanatory Notes for the chapter elaborate on this category with further examples:

> This heading covers equipment for all kinds of animals, of leather, composition leather, furskin, textiles or other materials.
>
> These goods include, *inter alia*, saddles and harness (including reins, bridles, and traces) for saddle, draught and pack animals, knee pads, blinkers and boots for horses, decorated trappings for circus animals, muzzles for any animal, collars, leads and trappings for dogs or cats, saddle cloths, saddle cushions and saddle bags, horse blankets specially shaped for the purpose, coats for dogs.

The HTSUS does not define "saddlery" or "harness," and so the court may "consult lexicographic and scientific authorities, dictionaries, and other reliable" or may rely on its "own understanding of the terms used." Baxter Healthcare Corp., 182 F.3d at 1337–38; see Millenium Lumber, 558 F.3d at 1328–29 (citation omitted); Carl Zeiss, 195 F.3d 1379 (citation omitted). The American Heritage Dictionary of the English Language, (3rd Ed., 1992 at pp. 825, 1586) defines "saddlery" as "[e]quipment, such as saddles and harnesses, for horses" and "harness" as "[t]he gear or tackle, other than yoke, with which a draft animal pulls a vehicle or an implement" or "[s]omething resembling such gear or tackle, as the arrangement of straps to hold a parachute to the body." Crucially, saddlery, harnesses, and the other exemplars listed in the heading and Explanatory Note

all fasten to the animal, while the pet carrier does not. Because Quaker Pet's products do not share the unifying characteristic of fastening to the animal that the imports included under heading 4201 share, they are different from saddlery and harnesses and cannot be classified under this category.

## CONCLUSION

Based on the undisputed material facts, Quaker Pet's products are properly classified under heading 6307 because they are made up articles of textiles that cannot be classified under any other heading. Consequently, the court grants Quaker Pet's motion for summary judgment. Quaker Pet's products shall be reliquidated under HTSUS subheading 6307.90.9889 and Quaker Pet will be refunded excess duties collected or payments tendered, including interest, to the extent provided by law.

**SO ORDERED.**

/s/   *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: March 29, 2019
       New York, New York